IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

DWAIN LEE KIRKLAND,                    *

    Plaintiff,                        *

vs.                                    *
                              CASE NO. 3:06-CV-107(CDL)
                          *

THE GUARDIAN LIFE INSURANCE
COMPANY OF AMERICA,                    *

    Defendants.                       *
_____

O R D E R

    This case arises from Defendant The Guardian Life Insurance
Company of America's denial of disability benefits to Plaintiff Dwain
Lee Kirkland.  Presently pending before the Court are Plaintiff's
Motion for Summary Judgment (Doc. 31), Defendant's Motion for Summary
Judgment (Doc. 27), and Plaintiff's Motion to Strike Defendant's
Response and Enter Judgment in His Favor (Doc. 50).  For the
following reasons, the Court grants Defendant's Motion for Summary
Judgment in part and denies it in part and denies Plaintiff's Motion
for Summary Judgment and Motion to Strike.

BACKGROUND

**I.   The Policy**

    Plaintiff Dwain Lee Kirkland is a former computer operator who
currently resides in Georgia.  Defendant The Guardian Life Insurance
Company of America ("Guardian"), which maintains its home offices in
New York, issued Plaintiff an individual disability income insurance

1

policy (the "Policy") with an effective date of April 12, 1984.[1]  The
Policy was delivered to Plaintiff in Florida, where he resided at the
time, and it contains a number of contractual provisions that are at
issue in this case.  First, the Policy requires Plaintiff to provide
Guardian with notice of a claim "within 30 days after any loss for
which it is liable occurs or starts, or as soon after that as is
reasonably possible." (Ex. 4 to Pl.'s Dep. 15.)[2]  Second, the Policy
provides that

> [w]ritten proof of loss must be given Guardian at its home
> office or any agency office:
> •    for loss from disability within 90 days after the end
>      of the period for which Guardian is liable;
> •    and for any other loss within 90 days of the date of
>      loss.
> If proof is not given within such time, claim will not be
> denied or reduced if:
> •    it was not reasonably possible to give proof within
>      such time; and
> •    proof is given to Guardian as soon as possible.
> In no case will Guardian pay benefits if the delay in
> furnishing proof of loss is more than a year, unless the
> insured has lacked legal capacity.

---

[1]The caption indicates that Plaintiff is suing "The Guardian Life
Insurance Company of America and others."  However, Plaintiff has never
specifically identified who these "others" might be, other than saying
that "Berkshire might be a possibility." (Pl.'s Dep. 176:19, Apr. 23,
2007.)  Berkshire Life Insurance Company "is a wholly-owned subsidiary of
The Guardian Life Insurance Company of America . . . .  Berkshire Life
administers claims under individual disability insurance policies issued
by The Guardian." (Faniel Aff. ¶ 2, July 27, 2007 [hereinafter Faniel
Aff. I].)  The Court therefore concludes that Plaintiff is suing only
Guardian and will refer to the Defendant as "Guardian" throughout the
Order for the sake of clarity.

[2]Portions of the copy of the Policy filed on CM/ECF are illegible.
(*See* Attach. 2 to Doc. 27.)  In addition, many of the pages of the Policy
are unnumbered.  Therefore, the Court will refer to the copy of the Policy
attached as Exhibit 4 to Plaintiff's deposition and will refer to the
pages of the Policy in sequential order.

(*Id.*)   Third, the Policy provides that "Guardian will not pay benefits under this policy for any period of disability during which the insured is not under the care of a physician" and defines "physician" as "a legally qualified physician other than the insured or [policy] owner."   (*Id.* at 6.)   Fourth, the Policy refers to "residual disability" coverage by which partial benefits could be paid when the insured is able to work, but "solely because of disability from sickness or injury, is unable to earn at a rate of at least 80% of his prior monthly earned income."   (*Id.* at 5.) Finally, the Policy provides for cost-of-living adjustments and waiver of premium benefits when the insured has been found to be disabled.   (*Id.* at 9, 18.)

## II.   Plaintiff's Claim for Disability Benefits

In February of 2003, Plaintiff first notified Guardian that he had become totally disabled and specified the date his disability began as February 1, 1993.   Berkshire Life Insurance Company ("Berkshire") sent Plaintiff the required claim forms on behalf of Guardian; these forms constituted the "proof of loss" required under the Policy.   After receiving repeated reminders from Berkshire, Plaintiff finally submitted the completed claim forms dated March 21, 2003 and August 28, 2003.   Plaintiff specified that he had become disabled at 12:00 a.m. on February 1, 1993 due to "radiation/heavy metal/chemical poisoning," although the symptoms of this disabling condition had begun at "birth."   (Ex. 4 to Def.'s Mot. for Summ. J. 2.)   Plaintiff stated that he "was unable to work in any occupation

3

at all due to reaction to, and prevalence of, electromagnetic fields and radiation." (*Id.*)

The forms also required Plaintiff to identify each physician from whom he sought treatment for his disability. Plaintiff identified his current provider as Paul V. Wickster, a chiropractor. In the Attending Physician Statement included with Plaintiff's claim form, Dr. Wickster reported that Plaintiff's "flu-like symptoms, malaise, [and] confusion" first appeared in 1962. (*Id.* at 6.) The statement also indicated that Plaintiff first sought treatment from Dr. Wickster on April 2, 2003, shortly after Plaintiff submitted his notice of claim. (*Id.*)

Plaintiff also indicated that from 1992 until April 2003, he was seen and treated for his disability by: (1) Around the Clock Medical in 1992 for unresolved prostatitis; (2) Dr. Paul Jacobsen in 1992 for wrist pain and ganglion cysts; (3) Dr. Richard Greene in August of 1998 for urethral itching; (4) Elaine Chan, an acupuncturist, in September of 1999 for impotence and lethargy; (5) San Souci Acupuncture in November of 1999 for impotence and lethargy; (6) an unspecified general practitioner in 2000 for depression, impotence, and lethargy; (7) Aventura Hospital in December of 2000 for right groin pain; (8) Holistic Massage and Wellness Center in April of 2001 for sore bowel; (9) Planned Parenthood in October of 2001 for a urinary tract infection; (10) Massage by Meadow in August of 2002 for trigger point therapy; and (11) Dr. James Haymore in February of 2003, who found "insufficient certainty of fibromyalgia diagnosis to

4

institute treatment or referral." (*Id.* at 9-16.) Plaintiff also listed a number of medical providers he had seen prior to his alleged period of disability, dating as far back as 1962.

### III. Claims Evaluation Process

Berkshire struggled for the next nineteen months to evaluate the merits of Plaintiff's disability claim. (Faniel Aff. I ¶ 13.) Berkshire initially focused on securing information relating to Plaintiff's disability for "the period immediately before and since March 2003, when [Plaintiff] first notified The Guardian that he claimed to have been disabled." (Faniel Aff. ¶ 5, Sep. 14, 2007 [hereinafter, Faniel Aff. II].) To this end, Berkshire sought records from Dr. Wickster and requested that Plaintiff provide his occupational information for the previous five years. Berkshire received no response from Plaintiff until January of 2004, and the response consisted of a list of medical providers similar to that submitted by Plaintiff in August of 2003. Plaintiff's response failed to provide his occupational information.[3] Despite lacking this information, Berkshire's representative visited Plaintiff on February 19, 2004 and paid Plaintiff benefits under a reservation of rights. The payment represented the benefits to which Plaintiff would be entitled from March 24, 2003 through January 24, 2004. Plaintiff returned the check without cashing it because he believed he was

---

[3]The record indicates that Plaintiff was represented by an attorney at least from early October of 2003 through December 5th, 2003. (Exs. C, D, & F to Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. [hereinafter, Def.'s Resp.].)

entitled to a substantially higher payment under the terms of the Policy.[4]

On March 18, 2004, Dr. Wickster completed a Progress Report regarding Plaintiff's disability and indicated that Plaintiff was not totally disabled.[5]  (*See* Ex. L to Def.'s Resp.)  Dr. Wickster also informed Berkshire that "neither he nor his staff had completed parts of the original Attending Physician Statement submitted with [Plaintiff's] claim, including Mr. Kirkland's date of first symptoms, height and weight, hospitalization dates and locations, dates of disability, restrictions and limitations, and objective and subjective findings."  (Faniel Aff. II ¶ 16.)  Shortly thereafter, Berkshire informed Plaintiff that his file would be closed because "based upon the information presently available, there is not sufficient proof to document a covered loss under the terms of your policy."  (Ex. J to Def.'s Resp.)  More specifically, Berkshire indicated that Plaintiff had failed to provide either a "certification of disability from a physician with accompanying restrictions or limitations" or "a completed employer's questionnaire that would describe the duties of your occupation."  (*Id.*)  Berkshire

---

[4]Guardian admits that the payment was, in fact, incorrect and should have been in the amount of $9,720.00 instead of $1,630.00.  The company inadvertently omitted a $900 per month social insurance substitute and paid Plaintiff only his $180 per month disability benefit.  (*See* Ex. 14 to Def.'s Mot. for Summ. J. 4.)  Plaintiff, however, believed he was entitled to approximately $121,000 in full payment for the ten-year period preceding his notice of claim.  (Ex. 11 to Pl.'s Mot. for Summ. J. 3.)

[5]Dr. Wickster submitted another progress report in June of 2004, again attesting that Plaintiff was not totally disabled.

also expressed concern that Dr. Wickster indicated that he did not fill out portions of the Attending Physician Statement. (*Id.*)

In response, Plaintiff contacted Berkshire in May of 2004 to inform them that he would attempt to provide the requisite information to substantiate his claim. In September of 2004, a Berkshire representative contacted Plaintiff to explain that although his Policy referred to residual disability, Plaintiff had paid no premiums for residual disability benefits. Thus, because Dr. Wickster had again certified that Plaintiff was not totally disabled, the documentation available to Berkshire indicated that Plaintiff was not entitled to benefits under the Policy. (Ex. L to Def.'s Resp.) Berkshire also informed Plaintiff that his delay in notifying the company of his claim "severely prejudiced" its ability to evaluate Plaintiff's claim and that Plaintiff had "indicated to [Berkshire] both verbally and in [his] correspondence that there were significant periods of time since 1993 that [he was] not under the care of any physician." (*Id.*)

In October and November of 2004, Plaintiff withdrew his authorization for Berkshire to obtain his medical records because Berkshire was allegedly harassing him and his health care providers; he also voiced these concerns in correspondence to Berkshire and Guardian representatives. In the meantime, however, Plaintiff began receiving treatment from Dr. Richard Born, a psychologist. Dr. Born diagnosed Plaintiff as suffering from several psychological conditions, including Posttraumatic Stress Disorder. "Based on an

Attending Physician's Statement received from Dr. Born . . . dated November 22, 2004, and records ultimately obtained from Dr. Born, [Plaintiff's] claim was accepted and benefits were paid effective March 2003.  Those benefit payments have continued to the present." (Faniel Aff. II ¶ 21.)

**IV.  Final Denial of Plaintiff's 1993-2003 Claims**

In December of 2005, Plaintiff requested that Berkshire review his entire medical history in order to gain a better understanding of his current, accepted disability and its origins.  Berkshire agreed to attempt to contact the providers listed in Plaintiff's original notice of claim and proof of loss, contingent upon Plaintiff signing another authorization to obtain his medical records. Plaintiff drafted his own authorization and returned it to Berkshire on May 27, 2005.  Berkshire was ultimately able to secure medical records from Dr. Jacobsen, Ms. Chan, and Aventura Hospital.  (Faniel Aff. I ¶ 15; Exs. 10, 11, 12, 13 to Def.'s Mot. for Summ. J.)  These records indicated that Dr. Jacobsen had seen Plaintiff seven times from 1993 until 2000 for prostatitis, ganglion cysts, an eye infection, a lesion in his mouth, and a cat bite.  Ms. Chan saw Plaintiff six times in July and August of 1999 for sore leg muscles, decreased sexual function, and stomach discomfort.  Aventura Hospital treated Plaintiff on December 29, 2000 for right groin pain. Berkshire was informed by Around the Clock Medical, Dr. Greene, Holistic Massage and Wellness Center, Planned Parenthood, and Massage by Meadow that they had no records of Plaintiff's treatment.

Berkshire forwarded these records to an independent consulting psychologist who concluded that the records contained "no documentation . . . of psychological symptomatology or functioning" or "any indication of impairment resulting from psychological or cognitive symptoms prior to [Plaintiff's] meeting with Dr. Richard Born in June 2004." (Ex. 26 to Pl.'s Mot. for Summ. J.) In addition, Berkshire forwarded the non-psychiatric medical records it was able to obtain to an independent consulting physician who likewise concluded that "prior to March 24, 2003, the medical evidence does not support a finding of any non-psychiatric condition that would cause impairment." (*Id.*) Moreover, the consulting physician "found that the evidence does not support impairment, restrictions or limitations on the basis of any non-psychiatric diagnosis." (*Id.*) Plaintiff's claim for benefits prior to March 24, 2003 was ultimately denied as of October 2006. (*Id.*)

For purposes of the pending motions, Guardian contends that it is entitled to summary judgment in its favor because Plaintiff failed to meet three of the Policy's conditions precedent to payment of the claim: (1) Plaintiff failed to provide a notice of claim within thirty days of the date his disability began; (2) Plaintiff failed to provide timely proof of loss in accordance with the Policy; and (3) Plaintiff failed to demonstrate that he was under the care of a physician at the time of his disability.[6] Conversely, Plaintiff

_____

[6]For purposes of the pending motions, Guardian does not appear to contend that Plaintiff was not disabled; rather, it bases its motion for summary judgment on the fact that Plaintiff failed to comply with the

contends that he is entitled to summary judgment because he has been disabled since February 1, 1993 and has met all the conditions precedent to the payment of his claim. Plaintiff also argues that Guardian's response to his motion for summary judgment was untimely and should be stricken.

DISCUSSION

## I.  Motion to Strike

The first motion pending before the Court is Plaintiff's Motion to Strike Defendant's Response and Enter Judgment in His Favor. Plaintiff contends that he filed for summary judgment on July 30, 2007, and thus Guardian's Response should have been due on August 20, 2007 per Local Rule of Civil Procedure 7.2, which provides respondent with "twenty (20) days after service of movant's motion and brief" to submit its response brief. Plaintiff correctly notes that Guardian failed to respond prior to this date; consequently, Plaintiff argues, Guardian's "'statement shall be deemed to have been admitted' and summary judgment must be entered in Plaintiff's favor." (Pl.'s Mot. to Strike Def.'s Resp. and Enter J. in His Favor ¶ 5.) Plaintiff's argument lacks merit, however, because given the procedural posture of this case, Guardian's response was timely.

The Court initially ordered the parties to submit their dispositive motions by July 31, 2007. While it is true that Plaintiff filed his *motion* for summary judgment on July 30, 2007,

---

foregoing conditions. Thus, the Court's Order should not be construed as expressing an opinion as to whether Plaintiff was, in fact, disabled prior to March 24, 2003.

Plaintiff failed to file an accompanying "memorandum of law citing supporting authorities," as expressly required by Local Rule of Civil Procedure 7. Plaintiff then requested an extension of time to allow him to file this accompanying brief. On August 2, 2007, the Court granted Plaintiff's motion. On August 13, 2007, Plaintiff timely filed his memorandum in support of his motion and his statement of undisputed material facts.

The briefing schedule was necessarily altered by the fact that Plaintiff filed his brief on August 13th. *See* Local R. Civ. P. 7.2 (requiring response to be filed "within twenty (20) days after service of movant's motion *and brief*" (emphasis added)). Because of this alteration, Guardian's brief was due on September 5, 2007, twenty-three days after service of Plaintiff's brief. *See* Local R. Civ. P. 6.3(a)(2) (providing three day extension to ordinary briefing schedule when service is effected by mail). However, the briefing schedule was again altered on August 31, 2007, when Guardian requested an extension to file its response. This extension was also permissible. Local Rule 6.2 permits the clerk of court and his deputies "to permit extensions of time to a date certain not to exceed fourteen (14) days for the filing of briefs." Because the deputy clerk granted Guardian's request for an extension, Guardian's response to Plaintiff's motion for summary judgment was due on September 14, 2007. Guardian filed its response and statement of disputed material facts on that day. Guardian's response was therefore timely, and the Court denies Plaintiff's Motion to Strike.

11

## II.  Motions for Summary Judgment

### A.  Summary Judgment Standard

Summary judgment is proper where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The moving party has the burden of showing that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  This burden can be met by showing that the non-moving party will be unable to "establish the existence of an element essential to [the non-moving party's] case, and on which [the non-moving party] will bear the burden of proof at trial."  *Id.* at 322.

Once the moving party has met its burden, the burden shifts to the non-moving party to show that there *is* a genuine issue of material fact.  *Id.* at 324.  A fact is material if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  There is a genuine issue if the evidence would allow a reasonable jury to find for the non-moving party.  *Id.*  In other words, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

In determining if the parties have met their respective burdens, the Court resolves "all reasonable doubts about the facts in favor of the non-movant, and draw[s] all justifiable inferences in his

12

. . . favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (internal quotation marks and citation omitted). Additionally, "[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (internal quotation marks and citation omitted).

In order to resolve this case on summary judgment, the Court must first determine which state's substantive law applies to each of Plaintiff's claims. Generally, "[a] federal court sitting in diversity will apply the conflict-of-laws rule of the forum state." *Grupo Televisa, S.A. v. Telemundo Commc'ns Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). A court must characterize each legal issue in question and then "determine[] the choice of law rule that the forum state applies to that particular type of issue." *Id.* Georgia follows "[t]he traditional method of resolving choice-of-law issues," using "a tripartite set of rules, which are lex loci contractus, lex loci delicti, and lex fori." *Brinson v. Martin*, 220 Ga. App. 638, 638, 469 S.E.2d 537, 538 (1996) (internal quotation marks and citation omitted).

In this diversity case, Plaintiff alleges three distinct theories of recovery: negligence, fraud, and breach of contract.[7]

---

[7]Plaintiff also contends "[t]hat the Defendants repeatedly engaged in interpretation of the Contract—a legal contract, in apparent violation of Georgia Law—in their letters to the Plaintiff." (Compl. ¶ 35.) To the extent that this can be construed as a claim for the unauthorized practice

Plaintiff also seeks attorney fees and a "25% Penalty on all amounts due the Plaintiff per State law." (Compl. ¶ 43.) Because this Court sits in Georgia, the Court will apply Georgia's tripartite set of conflict of law rules to determine which state's substantive law applies to each claim. The Court will then determine whether, under that state's law, summary judgment is appropriate.

### B. Plaintiff's Torts Claims

First, Plaintiff alleges tort claims for negligence and fraud. The Georgia Supreme Court recently reaffirmed that the traditional rule of *lex loci delicti* governs choice of law issues for tort actions brought in Georgia courts. *Dowis v. Mud Slingers, Inc.*, 279 Ga. 808, 816, 621 S.E.2d 413, 419 (2005). "Under this traditional rule, a tort action is governed by the substantive law of the state where the tort was committed." *Id.* at 809, 621 S.E.2d 414. Plaintiff has not clearly described where each allegedly fraudulent or negligent act actually took place. However, Plaintiff's claims

---

of Georgia law, the claim lacks merit. "Georgia law does not recognize a private right of action for the alleged unauthorized practice of law." *Oswell v. Nixon*, 275 Ga. App. 205, 207, 620 S.E.2d 419, 421-22 (2005) (noting that "the remedies for the unauthorized practice of law include criminal sanctions and allowing the state bar and certain bar organizations to pursue injunctive relief").

Additionally, in a text-only order dated August 22, 2007, the Court denied Plaintiff's Motion to Amend the Pleadings to include various additional claims. Thus, the Court will not address the claims raised in Plaintiff's Amended Complaint, which appear to include the substantive offenses and conspiracy to commit: (1) theft by taking in violation of Georgia law; (2) theft by deception in violation of Georgia law; (3) mail fraud in violation of federal law; (4) wire fraud in violation of federal law; and (5) Georgia RICO claims.

are without merit regardless of whether they occurred in Georgia, Florida, Massachusetts, or New York.[8]

### 1. Negligence

Plaintiff's negligence claim is based upon Guardian's failure to obtain his medical records before their destruction. Plaintiff contends that for two years, Guardian negligently delayed seeking records from the medical providers listed in his August 2003 proof of loss. This delay caused "[a]t least four sets of Plaintiff/affiant medical records [to be] subsequently irretrievable due to having been destroyed. These records could have substantiated Plaintiff/affiant's claim." (Pl.'s Br. Containing Argument & Citations of Authority in Supp. of Pl.'s Mot. Summ. J. 5.)

Even assuming Plaintiff can properly bring a tort claim for the allegedly negligent performance of a contractual duty and that Guardian acted negligently, no reasonable jury could conclude that Guardian's failure to request Plaintiff's records was the proximate cause of their destruction and the subsequent harm to Plaintiff. *See, e.g., Guida v. Lesser*, 264 Ga. App. 293, 297, 590 S.E.2d 140, 144 (2003) ("Proximate cause means that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred." (internal quotation

---

[8]From Plaintiff's submissions to the Court, it appears that any allegedly tortious conduct must have occurred in one of these states. Plaintiff has resided in either Georgia or Florida at all times relevant to this litigation; Berkshire's offices and its representatives are located in Massachusetts; and Guardian's offices are in New York.

marks and citation omitted)); *accord Sardell v. Malanio*, 202 So.2d 746, 747 (Fla. 1967); *Wallace v. Ludwig*, 198 N.E. 159, 161 (Mass. 1935); *Hoggard v. Otis Elevator Co.*, 276 N.Y.S.2d 681, 686 (N.Y. Sup. Ct. 1966). Plaintiff acknowledged in his deposition that he does not know whether his medical records were destroyed before or after he submitted his claim to Guardian in 2003. (Pl.'s Dep. 75:20-76:8; 79:7-25; 82:7-24; 201:25-202:16.) Plaintiff further testified that he destroyed some of his records himself. (Pl.'s Dep. 81:8-14.) The record therefore contains insufficient evidence to create a genuine issue of material fact as to whether Guardian's alleged delay proximately caused the destruction of the records. Guardian is therefore entitled to summary judgment on Plaintiff's negligence claims.

> 2. *Fraud*

Plaintiff also claims that Guardian committed fraud (1) by accepting Plaintiff's premium payments without intending to pay the benefits and (2) by purposely failing to request Plaintiff's medical records in a timely fashion. Again assuming that this claim is properly brought as a tort action, Plaintiff has directed the Court to no evidence that Guardian made any false representation on which Plaintiff detrimentally relied.[9] *See, e.g., Lusins v. Cohen*, 853

---

[9]Plaintiff apparently bases this claim on the continued communication between himself and Berkshire, contending that Guardian was merely "stringing the Plaintiff along by promising a resolution based on Plaintiff supplying them with more information on his medical treatment" with the goal of "keep[ing] the Plaintiff involved in the claim process in such a way that he would not file suit for breech [sic] of contract

N.Y.S.2d 685, 687 (N.Y. App. Div. 3d Dep't 2008) (in order to state a claim for fraud, "a plaintiff must allege misrepresentation or concealment of a material fact, falsity, scienter by the wrongdoer, justifiable reliance on the deception, and resulting injury") (internal quotation marks and citation omitted)); *Tankersley v. Barker*, 286 Ga. App. 788, 789 n.1, 651 S.E.2d 435, 437 n.1 (2007) ("The elements of fraud are: false representation by the defendant, scienter, intent to induce the plaintiff to act or refrain from acting, plaintiff's justifiable reliance on the false representation and damages to the plaintiff."); *Chan v. Chen*, 872 N.E.2d 1153, 1157 (Mass. App. Ct. 2007) ("To prevail on a claim for fraud or deceit, a plaintiff must prove as an essential element of the claim that the defendant has knowingly made a false statement of material fact, intending that the plaintiff rely thereon, and upon which the plaintiff did rely."); *Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So.2d 13, 15 (Fla. Dist. Ct. App. 2d 2002) ("The essential elements of a fraud claim are: (1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation

---

till after the statute of limitations had expired." (Pl.'s Mot. for Summ. J. ¶ 3.) This contention is unsubstantiated in the record. Plaintiff was made aware that there were potential problems with the timeliness of his claim from the outset of the claims resolution process. (*See, e.g.,* Ex. 4 to Pl.'s Mot. for Summ. J. (notifying Plaintiff on August 22, 2003 that "there are provisions in your policy that pertain to the timeliness of filing a claim. While we are clearly outside of these parameters, we are unsure what effect, if any, that this may have on your claim."); Ex. 2 to Pl.'s Mot. for Summ. J. (informing Plaintiff of time constraints on May 13, 2003).)

induces another's reliance; and (4) consequent injury by the other party acting in reliance on the representation."). Therefore, under the laws of Georgia, Florida, Massachusetts, and New York, Guardian is entitled to summary judgment on Plaintiff's fraud claims.

C.  Plaintiff's Breach of Contract Claims

1.  *Choice of Law*

Plaintiff also alleges claims for breach of contract. Georgia has adopted the general rule that where a contract contains no choice of law or jurisdiction provision, the location where the contract was executed determines the applicable law under the principle of *lex loci contractus. Gen. Tel. Co. of Se. v. Trimm*, 252 Ga. 95, 95, 311 S.E.2d 460, 461 (1984). Where the contract contemplates execution in another jurisdiction, however, that state's law will apply. *Id.* To determine where the contract was executed, a "court must determine where the last act essential to the completion of the contract was done." *Id*. "With regard to insurance contracts, Georgia law provides that the last act essential to the completion of the contract is delivery; consequently, insurance contracts are considered made at the place where the contract is delivered." *Johnson v. Occidental Fire & Cas. Co. of N.C.*, 954 F.2d 1581, 1584 (11th Cir. 1992).

Based upon these legal principles, Guardian contends that the Court must apply Florida law to resolve the breach of contract claims in this case because the Policy was delivered in Florida. Plaintiff,

however, urges the Court to rely on an exception to the *lex loci contractus* rule that provides that "where a state has no substantial relationship to the parties or the transaction, or the result obtained from the applicability of the law of the chosen state would be contrary to Georgia's public policy," then "Georgia's conflict of law rules mandate the application of Georgia law." *Id.* (internal quotation marks and citation omitted). Plaintiff contends that because he moved from Florida to Georgia in 2002, a "substantial relationship" between the parties and Florida no longer exists, and therefore Georgia law should apply.

The Court finds that Florida law applies to this case. First, Plaintiff has not demonstrated that an application of Florida law would contravene Georgia public policy, and it appears that Georgia and Florida law are similar with respect to the claims at issue here. (*See* Def.'s Resp. 13-16 (analyzing both Georgia and Florida substantive law).) In addition, the Court finds that there is a substantial relationship between Florida, the parties, and the disputed insurance Policy. Not only was the Policy delivered in Florida, but Plaintiff lived in Florida and sought medical treatment there for the majority of the period for which he claims benefits should have been paid. Furthermore, the contract contains a Florida statutory rider that ensures the contract complies with Florida law. (Ex. 4 to Pl.'s Dep. 11.) Accordingly, the Court will apply Florida law to resolve Plaintiff's breach of contract claims.

2.  *Disability Claims from February 1, 1993 to March 24, 2003*

Plaintiff claims that he is entitled to summary judgment because Guardian breached its contractual duty to provide him with disability benefits from February 1, 1993 to March 24, 2003.  Guardian contends that it is entitled to summary judgment because Plaintiff failed to fulfill the Policy's conditions precedent to its duty to pay him benefits.  Thus, summary judgment in either party's favor would not be warranted if, under Florida law, genuine issues of material fact exist as to whether either party failed to comply with its contractual duties.

i.  MEDICAL CARE REQUIREMENT

Guardian first submits that it is not liable for benefits because Plaintiff failed to meet the Policy's medical care requirement.  Guardian emphasizes that Plaintiff admitted that he did not have regularly-scheduled appointments with his medical care providers, (Pl.'s Dep. 151:3-13), and that "[t]he policy provides that no benefits will be paid 'for any period during which the insured is not under the *regular* care of a physician.'" (Def.'s Mem. in Supp. Mot. for Summ. J. 16 (emphasis added).)

However, the Policy actually reads: "Guardian will not pay benefits under this policy for any period of disability during which the insured is not under the care of a physician." (Ex. 4 to Pl.'s Dep. 6.)  Under Florida law, such "care and attendance" clauses are construed liberally in favor of coverage.  *See, e.g., Fritz v.*

20

*Standard Sec. Life Ins. Co. of N.Y.*, 676 F.2d 1356, 1358 (11th Cir. 1982) (applying Florida law); *see also Mutual Ben. Health & Accident Ass'n v. Bunting*, 183 So. 321, 327 (Fla. 1938) (observing that even very strict care and attendance provisions "merely require[] substantial compliance" with the terms of the policy). The plain language of the Policy does not require Plaintiff to maintain regularly-scheduled appointments with his doctors. Moreover, the plain language of the medical care requirement does not necessarily require that the physician's care relate directly to the alleged disability. Here, Plaintiff has shown that although he may not have had regular appointments with his doctors, he was being treated by a physician during at least some of the period for which he is claiming benefits. (*See* Exs. 10 & 12 to Def.'s Mot. for Summ. J.) The Court therefore concludes that, at least for the period where Plaintiff has shown he was being treated by a physician, genuine issues of material fact exist, precluding the grant of summary judgment in Guardian's favor on this basis.[10]

---

[10]The Court further finds that genuine issues of fact remain as to when Plaintiff was actually under the care of a physician and whether he actually complied with the plain language of the medical care provision. The record indicates that there were some periods during which Plaintiff was receiving no medical care whatsoever. (*See* Ex. L to Def.'s Resp.) The record is also unclear as to whether Plaintiff received his care from a "physician" as required by the Policy. Plaintiff apparently undertook "approximately 1100 hours of self-administered trigger point therapy, reflexology and cranial sacral massage" and "also developed a technique for clearing and scanning allergies." (Ex. 4 to Def.'s Mot. for Summ. J. 16.) Under the plain language of the Policy, self-treatment does not meet the medical care requirement. *See, e.g., Mack v. Unum Life Ins. Co. of Am.*, 471 F. Supp. 2d 1285, 1290 (S.D. Fla. 2007) (applying Florida law and finding plaintiff's self-treatment of diabetes did not meet medical care

## ii.  NOTICE REQUIREMENTS

Guardian next claims that summary judgment is appropriate because Plaintiff failed to provide timely notice of his claim and/or timely proof of loss in accordance with the Policy.  Guardian also contends that this failure prejudiced its ability to contemporaneously evaluate Plaintiff's disability claim.  Because no reasonable jury could find that Plaintiff complied with these provisions in a timely manner, summary judgment in favor of Guardian is granted to the extent that Plaintiff asserts he is entitled to disability benefits from February 1, 1993 until March 23, 2003.

### a.    Compliance with Specified Time Limits

The Court first finds that Plaintiff did not provide his notice of claim or proof of loss within the time limits specified by the Policy.  Florida law recognizes that an insurer may be relieved from its liability for benefits when the insured has failed to comply with an insurance policy's notice provisions.  *See, e.g., Am. Fire & Cas. Co. v. Collura*, 163 So.2d 784, 790-91 (Fla. Dist. Ct. App. 1964) ("[W]here the policy contains a clause requiring that notice of an accident be given 'as soon as practicable' . . . in the absence of

---

provision requiring "that he obtain appropriate medical care from someone other than himself").  In addition, much of Plaintiff's care was obtained from alternative medical practitioners, such as acupuncturists and massage therapists.  It is unclear whether this alternative care would also be considered to determine whether Plaintiff met the medical care requirement.  However, the Court need not resolve these issues because the Court finds that genuine issues of material fact exist as to whether Plaintiff complied with one of the conditions precedent to the recovery of his benefits, Plaintiff's motion for summary judgment must be denied.

22

a valid excuse for the delay, [a breach of that clause] relieves the company of the obligation to defend the insured."); *see also Morton v. Indem. Ins. Co. of N. Am.*, 137 So.2d 618, 620 (Fla. Dist. Ct. App. 1962), *overruled on other grounds by Collura*, 163 So.2d at 793-94 (finding that the failure to give notice for more than six months was a breach of the policy that relieved the insurer of liability for benefits).

In this case, the Policy requires that "[n]otice of claim must be given Guardian within 30 days after any loss for which it is liable occurs or starts, or as soon after that as is reasonably possible." (Ex. 4 to Pl.'s Dep. 15.) Plaintiff's Notice of Claim was dated March 25, 2003 and specified his disability as "toxicity symptoms, unknown origin" that began on February 1, 1993. (Ex. 3 to Def.'s Mot. for Summ. J.) At the earliest, Plaintiff alerted Guardian to his potential disability in February of 2003. (Pl.'s Dep. 76:22, 77:9-12.) It is therefore clear, and the parties do not dispute, that Plaintiff filed his notice of claim more than thirty days after the date he became disabled.

Likewise, Plaintiff failed to file his proof of loss within the time limit specified by the Policy. The Policy requires the insured to provide such proof "within 90 days after the end of the period for which Guardian is liable." (Ex. 4 to Pl.'s Dep. 15.) Guardian claims that "'[t]he period for which Guardian is liable' is in increments of one month." (Def.'s Mem. in Supp. Mot. for Summ. J. 13 n.3.) In support of this construction, Guardian points out that

the Policy provides that "all accrued benefits for disability" will be paid monthly. (*Id.* at 12.) According to Guardian, Plaintiff's written proof of loss for a disability that began on February 1, 1993 would have been due no later than July 1, 1993.[11]

Plaintiff, however, argues that "[t]he word 'period' is used multiple times in the language of the policy to define varying lengths of time." (Pl.'s Resp. to Def.'s Mot. for Summ. J. 18 [hereinafter Pl.'s Resp.].) For example, Plaintiff points to the schedule page of his Policy, which "states that the maximum benefit period is 'to 65, but not less than 2 years.'" (*Id.*) Accordingly, Plaintiff argues that "the period for which Guardian is liable" "can obviously be 36 years" and that he provided proof of loss well within this thirty-six year period. (*Id.*)

"The interpretation of an insurance contract is a question of law[.]" *Kattoum v. N.H. Indem. Co.*, 968 So.2d 602, 604 (Fla. Dist. Ct. App. 2007). Any ambiguous provisions in an insurance contract must be "interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." *Transcon. Ins. Co. v.*

---

[11]Guardian explains this calculation as follows:

If plaintiff's disability had begun on February 1, 1993, as now alleged, benefits first would have been payable for the month beginning March 3, 1993, the end of the 30-day elimination period. The end of the first "period for which Guardian is liable" would have been April 2, 1993. Ninety days from that date was July 1, 1993, which is the date when proof of loss was first due."

(Def.'s Mem. in Supp. Mot. Summ. J. 13.)

*Jim Black & Assocs., Inc.*, 888 So.2d 671, 675 (Fla. Dist. Ct. App. 2004) (internal quotation marks and citation omitted). The terms should be "interpreted in a reasonable manner, consistent with the objectives and intentions of the contracting parties, i.e., to provide disability benefits in the event [Plaintiff] established that he had become physically disabled during the term of the policy." *McPhee v. The Paul Revere Life Ins. Co.*, 883 So.2d 364, 368 (Fla. Dist. Ct. App. 2004).

The Court concludes that Plaintiff's interpretation of the Policy is unreasonable as a matter of law. "[T]he purpose of a provision for notice and proofs of loss is to enable the insurer to evaluate its rights and liabilities, to afford it an opportunity to make a timely investigation, and to prevent fraud and imposition upon it." *Laster v. U.S. Fid. & Guar. Co.*, 293 So.2d 83, 86 (Fla. Dist. Ct. App. 1974) (internal quotation marks and citation omitted). Under Plaintiff's interpretation of the Policy, Guardian would be prevented, perhaps for decades, from evaluating claims for which it might be liable. This construction is neither consistent with the purpose of a proof of loss provision nor "with the objectives and intentions of the contracting parties." *McPhee*, 883 So.2d at 368.

The Policy plainly provides that Guardian will pay any benefits for which it is liable monthly. (Ex. 4 to Pl.'s Dep. 4.) Thus, the most reasonable construction of the contract is that "the period for which Guardian is liable" occurs on a monthly basis. In order for

Plaintiff's proof of loss to be timely for a disability date of February 1, 1993, Plaintiff should have filed his proof of loss by July 1, 1993.  Based on the foregoing, it is clear that Plaintiff failed to file both his notice of claim and proof of loss within the times specified by the Policy.

### b.  Notice Filed within Reasonable Time

Despite this delayed notice, however, Plaintiff could still demonstrate compliance with the terms of the Policy by establishing (1) that he notified Guardian of his claim for disability benefits as soon as was reasonably possible and (2) that it was not reasonably possible for him to submit his proof of loss within ninety days after the end of the period for which Guardian is liable.  (Ex. 4 to Pl.'s Dep. 15.)  Whether the insured has complied with a policy provision containing language such as that requiring notice of loss to be provided "'as soon as practicable' . . . has been construed to mean that notice is to be given with reasonable dispatch and within a reasonable time in view of all the facts and circumstances of the particular case." *State Farm Mut. Auto. Ins. Co. v. Ranson*, 121 So.2d 175, 181 (Fla. Dist. Ct. App. 1960), *overruled on other grounds by Collura*, 163 So.2d at 793-94.  "Florida courts have uniformly held that the determination of what is a reasonable time depends on the circumstances and is ordinarily a question of fact for the jury or fact-finder." *Sims v. Am. Hardware Mut. Ins. Co.*, 429 So.2d 21, 22 (Fla. Dist. Ct. App. 1982).  However, when the surrounding facts and

circumstances "are undisputed and different inferences cannot reasonably be drawn therefrom, the question is for the court." *Ranson*, 121 So.2d at 182.

Plaintiff justifies his delayed notice by arguing that he "could not possibly have notified Guardian concerning his Electrical Sensitivity and Multiple Chemical Sensitivity any earlier than August 2003 because he was completely unaware until that time that these conditions were a part of what was affecting him." (Pl.'s Resp. 9.) Plaintiff testified that although he understood that he was "having physical problems that no doctor can put a finger on . . . I was told[] that I was just a lazy person that didn't want to work, and I pretty much bought into that[.]" (Pl.'s Dep. 177:5-20.) Plaintiff finally "came to the conclusion that I was disabled in 1993 after a total collapse in 2003 where I was completely unable to function. After looking over the whole scenario I could see that I had first reached an inability to do my job in 1993." (Pl.'s Aff. ¶ 1(b), July 30, 2007 [hereinafter, Pl.'s Aff. I].) Plaintiff essentially argues that his delayed notice should be excused because he was unaware that he was "totally disabled" within the meaning of the Policy.

The Court finds Plaintiff's justification unavailing. The Policy states: "Total disability means that, because of sickness or injury, the insured: is unable to perform all the substantial and material duties of his occupation or profession; and is not actually engaged in any other occupation or profession." (Ex. 4 to Pl.'s Dep. 5.) In his deposition, Plaintiff listed numerous physical causes of

27

his disability, and he admitted that he knew he suffered from those conditions from 1993 through 2003. (*See, e.g.,* Pl.'s Dep. 177:22-178:2.) Plaintiff also knew that he was unable to work for approximately nine of the ten years following his "implosion" in 1993. (*See id.* at 53:12-56:8.) Thus, there appears to be no good reason why Plaintiff could not have reported that his illness was causing his inability to work prior to 2003.[12]

Construing the facts in favor of Plaintiff, it appears that Plaintiff simply misjudged the nature and extent of his condition. Courts have routinely found that similar justifications do not justify a delay in providing notice of claim or proof of loss. *See, e.g., Barco v. Penn Mut. Life Ins. Co. of Philadelphia*, 126 F.2d 56, 57 (5th Cir. 1942) (applying Florida law and holding that delayed notice was not excused by insured's sincere religious belief that his disability was not permanent); *Lane v. Provident Life & Accident Ins. Co.*, 178 F. Supp. 2d 1281, 1287 (S.D. Fla. 2001) (applying Florida

---

[12]It also took Plaintiff nearly six months after he decided to file a claim to file the proper paperwork substantiating his claim and considered to be his proof of loss. (Pl.'s Dep. 78:14-79:6.) Plaintiff contends that this delay was justified because

> [i]t took me that long to get myself together enough where I could actually get something down. I had to have some inclination of what on earth was going on here, because it was—not only was I multiply chemical sensitive, but I also was like sensitive to electro magnetic. It was just blasting.

(Pl.'s Dep. 79:1-6.)

law and finding that delayed notice was not excused by insured's belief that disabling condition was transitory); *Ranson*, 121 So.2d at 178, 182 (delayed notice was not excused when plaintiff did not consider accident serious enough to report to insurer); *see also Equitable Life Assurance Soc'y of U.S. v. Studenic*, 77 F.3d 412, 416 (11th Cir. 1996) (applying Georgia law and finding that delayed notice was not excused by the fact that the plaintiff did not think about filing a disability claim, believed his condition would improve, and believed that being "disabled" meant being paraplegic). Although the Court sympathizes with Plaintiff's plight, under the facts and circumstances of this case, no jury could conclude that it was reasonable for Plaintiff to suffer from this reportedly debilitating condition and remain almost constantly unemployed for ten years before contacting his disability income carrier. Thus, the Court finds that, as a matter of law, Plaintiff did not comply with the Policy's notice requirements within a reasonable time.[13]

### c. Presumption of Prejudice

---

[13]The Court also notes that it would have been difficult for Plaintiff to comply with the terms of the Policy or understand that the Policy definition of "totally disabled" since his testimony indicates that he failed to look at the Policy until 2003. (Pl.'s Dep. 109:17-20.) Plaintiff's failure to read the contract does not excuse him from complying with its provisions. *See, e.g., Sabin v. Lowe's of Fla., Inc.*, 404 So.2d 772, 773 (Fla. Dist. Ct. App. 1981) ("'No party to a written contract in this state can defend against its enforcement on the sole ground that he signed it without reading it.'" (quoting *Allied Van Lines v. Bratton*, 351 So.2d 344, 348 (Fla. 1977).)

The fact that Plaintiff failed to timely file his notice of claim and proof of loss does not necessarily end the Court's inquiry. Rather, under Florida law, failure to comply with these provisions merely creates a presumption that the insurer was prejudiced. *See, e.g., Tiedtke v. Fid. & Cas. Co. of N.Y.*, 222 So.2d 206, 209 (Fla. 1969). The insured can rebut this presumption with evidence that the insurer was not prejudiced by the delay. *See id.*

In this case, Plaintiff has failed to produce any evidence that would rebut this presumption of prejudice. It is clear that Guardian was unable to obtain medical records from some of Plaintiff's past providers who may have been able to substantiate or refute Plaintiff's claims. More importantly however, although Plaintiff has now come forward with evidence that he may have been disabled as early as 1993, (*see* Attach. 1 to Born Aff., July 19, 2007), Guardian was deprived of the opportunity to schedule an independent, contemporaneous medical evaluation of Plaintiff's disability as expressly permitted by the Policy. *See, e.g., Laster*, 293 So.2d at 87 (finding that "[a] prompt reporting" of the disputed loss "may have enabled the insurer to better investigate and assess its rights and liabilities"); (Ex. 4 to Pl.'s Dep. 15.) Plaintiff's failure to comply with the Policy's notice and/or proof of loss provisions, coupled with Plaintiff's failure to rebut the presumption of prejudice to Guardian, compel the Court to grant summary judgment in

favor of Guardian on Plaintiff's breach of contract claims, at least to the extent the breach of contract is based on Guardian's failure to pay benefits from February 1, 1993 until March 24, 2003.

### d. Breach of Contract Claims for COLA Adjustments and Waiver Benefits

Plaintiff also alleges that Guardian breached the contract by failing to pay him all cost-of-living adjustments and by failing to refund or waive his premiums in accordance with the terms of the Policy. The Policy provides that

> [i]f the insured is disabled before age 65 for a continuous period of at least 90 days, during all of which time this policy is in force, Guardian will:
>
> • refund any premiums paid during that 90 days; and
> • waive any later premiums that fall due during that period of continuous disability or within three months after the insured's full recovery.

(Ex. 4 to Pl.'s Dep. 9.) In addition, the Policy contains a cost of living rider that allows the monthly benefit to be adjusted "at the end of each twelve months of a continuous claim to reflect changes in the cost of living since the start of such claim." (*Id.* at 18.)

With respect to Plaintiff's claim for additional cost-of-living adjustments, Guardian contends that after reviewing Plaintiff's claim, "Berkshire determined that additional cost-of-living benefits of $917.04 were owed and the additional benefits were paid to plaintiff on July 18, 2007." (Faniel Aff. I ¶ 23.) Plaintiff admits that he received this payment, but "would never accept as true that

31

Guardian has paid all COLA benefits because they have given me no accounting of any kind whatsoever for the amounts paid." (*See* Pl.'s Aff. ¶¶ 22, 23, Aug. 23, 2007 [hereinafter Pl.'s Aff. II].) Plaintiff has directed the Court to no evidence beyond this speculative assertion that would substantiate his claim that he was entitled to cost-of-living adjustments beyond what he admits he received. Accordingly, the Court finds that no genuine issues of material fact exist as to whether Guardian breached the Policy by failing to pay Plaintiff the cost-of-living adjustments to which he was entitled under the Policy. *See, e.g., Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("'[U]nsupported speculation . . . does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'" (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.2d 928, 931-32 (7th Cir. 1995)) (second alteration in original).

With respect to Plaintiff's refund and waiver of premium claims, however, the present record contains insufficient evidence to allow the Court to resolve the matter on summary judgment. Plaintiff avers that there was never a premium waiver and that he has "constantly paid the premiums." (Pl.'s Dep. 210:17-23; Pl.'s Aff. II ¶ 24.) Lance Faniel, Berkshire's Claims Manager, avers that "[w]hen

Berkshire determined that [Plaintiff] was entitled to disability benefits, the company refunded the premiums that he had paid since his date of disability in 2003. [Plaintiff's] premiums have been waived since then, and no additional premiums have been received by Berkshire." (Faniel Aff. I ¶ 24.)

Neither party has produced evidence beyond these affidavits to corroborate or refute these alleged payments, and the Court is precluded from weighing the credibility of the affiants on the parties' motions for summary judgment. *See, e.g., Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1299 (11th Cir. 1983) ("It is well established that '[t]he district court's function, in a summary judgment proceeding, is not to resolve factual issues but to determine whether there is a genuine issue of material fact. In making its determination, the court may not weigh conflicting affidavits to resolve disputed fact issues.'") (quoting *Farbwerke Hoeschst A.G. v. MV Don Nicky*, 589 F.2d 795, 798 (5th Cir. 1979)). Summary judgment is therefore inappropriate, but only as to this narrow claim. The Court will, however, give Defendant thirty days to supplement its motion with evidence establishing that it has refunded and/or waived Plaintiff's premiums since the date it established Plaintiff was disabled. Plaintiff will have twenty days to respond with evidence that those premiums have not been refunded and/or waived. The Court also emphasizes that its decision that

Plaintiff is not entitled to benefits from February 1, 1993 until March 24, 2003 precludes Plaintiff from recovering any waiver of premium benefit for that time period.

### D. Plaintiff's Extracontractual Damages Claims

Finally, Plaintiff's Complaint alleges that he is entitled to "a 25% Penalty on all amounts due the Plaintiff per State Law, plus costs, plus a reasonable attorney's fee." (Compl. ¶ 43.) Plaintiff's entitlement to these damages is governed by Georgia law. *See, e.g., John Hancock Mut. Life Ins. Co. v. Yates*, 299 U.S. 178, 181 (1936) (observing that in Georgia, "as elsewhere, the validity, form, and effect of contracts are to be determined generally by the law of the place where made, but the character and extent of the remedies and the mode of procedure by the law of the forum"); *accord Fed. Ins. Co. v. Nat'l Distr. Co., Inc.*, 203 Ga. App. 763, 765, 417 S.E.2d 671, 673 (1992) ("Under the rule of lex fori, procedural or remedial questions are governed by the law of the forum, the state in which the action is brought").

Plaintiff presumably bases his claim on O.C.G.A. § 33-4-6, which provides that penalties and attorney fees may be assessed against an insurer who fails to pay a claim in bad faith. Under Georgia law, however, "[p]enalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and there is a disputed question of fact." *Fed. Ins. Co.*, 203 Ga. App.

at 768, 417 S.E.2d at 676 (internal quotation marks and citation omitted). In this case, Plaintiff's failure to timely produce notice of claim and proof of loss provides Guardian with a "reasonable ground to contest the claim." *Id.* Bad faith penalties and attorney fees are therefore not appropriate in this case, and Guardian is entitled to summary judgment on that claim.

## CONCLUSION

For the reasons stated herein, the Court denies Plaintiff's Motion to Strike Defendant's Response and Enter Judgment in His Favor (Doc. 50) and Plaintiff's Motion for Summary Judgment (Doc. 31). The Court grants Defendant's Motion for Summary Judgment (Doc. 27) in part and denies it in part. Further, the Court permits Defendant to supplement its Motion for Summary Judgment within thirty days with evidence establishing that it has refunded and/or waived Plaintiff's premiums in accordance with the Policy. Plaintiff will have twenty days to respond to any such filing with evidence establishing that he has paid the disputed premiums and that the premiums have not been refunded.

IT IS SO ORDERED, this 5th day of May, 2008.


                                        S/Clay D. Land
                                        CLAY D. LAND
                                        UNITED STATES DISTRICT JUDGE